# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

BRUNO PROJECT RESCUE, INC., a
501(c)(3) corporation, ANNIE'S FAITH
FOUNDATION, a 501(c)(3) corporation,
CARIBBEAN CANINE CONNECTION, a
501(c)(3) corporation, ARUBA FLIGHT
VOLUNTEERS D/B/A NEW LIFE FOR
PAWS FOUNDATION, a 501(c)(3)
corporation, POTCAKE PLACE K9 RESCUE
(USA) INC., a 501(c)(3) corporation, SAVE
THE SATOS, a 501(c)(3) corporation,

        Plaintiffs,

v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, CENTERS FOR
DISEASE CONTROL AND PREVENTION,
and MANDY K. COHEN, in her official
capacity as Director of the Centers for Disease
Control and Prevention,

        Defendants.

Civil Action No. 24-cv-11552-DJC

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO STAY

## PRELIMINARY STATEMENT

On May 13, 2024, the Centers for Disease Control and Prevention ("CDC") in the
Department of Health and Human Services ("HHS") announced a revision to its regulation at 42
C.F.R. 71.51, "Control of Communicable Diseases; Foreign Quarantine:  Importation of Dogs and
Cats".  The revision, aimed at enhancing public health by reducing fraud and preventing the
reintroduction of the deadly dog-maintained rabies virus variant ("DMRVV" or "dog rabies") in
the United States, makes several updates to the criteria which all dogs entering the United States

must follow.  Most notably, the revised regulation requires that all dogs entering the United States be microchipped, be at least six months of age, and be accompanied by a CDC Dog Import Form. The revised regulation goes into effect on August 1, 2024.

Plaintiffs are a group of 501(c)(3) corporations that "share the common goal" of saving and finding homes for street dogs who were born on Caribbean islands.  Doc. 7, ¶ 1.  In their Amended Complaint, Plaintiffs claim the revised regulation is unlawful and they seek to enjoin it in full.  *Id.*  Their Motion for Stay is more narrow, however, and seeks to stay the effective date of the revised regulation only to the extent that it prohibits the importation of an adopted dog that (1) is arriving to the United States from a Caribbean island that the CDC has deemed canine rabies-free as of July 6, 2024 and (2) has been given a "clean bill of health" by a qualified veterinarian recognized by the country from which the dog is arriving.  *See* Doc. 10, p. 2.  At the heart of their Motion is Plaintiffs' contention that the six-month age requirement is not necessary, in their view, to prevent the spread of communicable diseases like dog rabies.

Plaintiffs' common goal, while laudable, does not outweigh the potential threat to public health and safety that the reintroduction of DMRVV and other zoonotic diseases could pose to families, communities, and pets in the United States—a threat the revised regulation aims to prevent.  And, to the point here, Plaintiffs have not demonstrated their likelihood of success on the merits, or that any harm they might suffer would outweigh the public's strong interest in preventing a communicable disease from being introduced or reintroduced into the United States.  For these reasons, and as described more fully below, Plaintiffs' Motion for Stay should be denied.

## BACKGROUND

### I.      Regulatory Background

Section 361 of the Public Health Service Act, 42 U.S.C. § 264, authorizes the Secretary of HHS to make and enforce such regulations as in the Secretary's judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the United States and from one State or possession into any other State or possession.[1]   It also authorizes the Secretary to promulgate and enforce a variety of public health regulations to prevent the spread of communicable diseases, including through inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be sources of dangerous infection to human beings, and other measures.   *Id.*   Since 1956, Federal quarantine regulations (currently found at 42 C.F.R. 71.51), enacted under this authority, have controlled the entry of dogs into the United States.   *See* 21 FR 9870 (Dec. 12, 1956).

### A.      The 1956 Regulation

Under the 1956 regulation, any dog arriving in the United States for non-research purposes was required to prove vaccination by presenting a "valid rabies vaccination certificate" unless 1) the dog was less than six months of age and had only been in a rabies-free country; or 2) the dog was older than six months and been only in a rabies-free country for the six months prior to arrival. 42 C.F.R. § 71.51(c).  A "valid rabies vaccination certificate" was defined as a "certificate which was issued for a dog not less than three months of age at the time of vaccination" and which, among other things, specified a "date of rabies vaccination at least 30 days before the date of arrival

---

[1] Although the statute assigns authority to the Surgeon General, all statutory powers and functions of the Surgeon General were transferred to the Secretary of HHS in 1966.  *See* 31 FR 8855, 80 Stat. 1610 (June 25, 1966).  *See also* Public Law 96-88, sec. 509(b), October 17, 1979, 93 Stat. 695 (codified at 20 U.S.C. § 3508(b)).

of the dog at a U.S. port."  42 C.F.R. § 71.51(a).  Put another way, the regulation required a dog arriving from a non-rabies-free country to be four months old before it could be imported to the United States.

> **B.**      **The 2021 Temporary Suspension**

In 2020, the CDC launched an agency-wide response to the COVID-19 pandemic, dedicating over 7,200 of its approximate 10,000 CDC personnel to support the outbreak response. *See* 86 FR 32041, 32043.  At the same time, the CDC observed a noticeable increase[2] in the number dogs arriving from high-risk countries with fraudulent rabies vaccination documentation.[3]  *Id.* Without adequate public health resources to manage the increase in fraud, the CDC announced a temporary suspension on the importation of dogs from high-risk countries into the United States. *Id.* at 32041.  The temporary suspension is set to expire on July 31, 2024.  88 FR 43570.

> **C.**      **The 2024 Revised Regulation**

As the 1956 regulations had not been updated in nearly 67 years, in 2023 HHS/CDC began the process of updating its regulations to reflect developments in recent years that have affected dog imports, including the significant growth of the animal rescue industry and international trade in dogs for adoption and resale, as well as the increase in fraud.  *See* Declaration of Dr. Emily Pieracci, attached hereto as *Exhibit 1*, ¶ 17.  HHS/CDC issued a Notice of Proposed Rulemaking

---

[2] Though fraud increased noticeably during the COVID-19 pandemic, fraud amongst animal rescue groups was already on the rise, with at least three instances of rabid dogs with fraudulent documentation being imported by animal rescue groups between 2015-2019.  These instances are discussed below.

[3] CDC experts in the Poxvirus and Rabies Branch conduct annual assessments of individual countries' rabies statuses worldwide to inform its recommendations regarding animal importation. *See* Rabies Status:  Assessment by Country (http://cdc.gov/rabies/country-risk/index.html) (last visited July 21, 2024).

(NPRM) on July 10, 2023.  *See* NPRM, 88 FR 43978, attached hereto as *Exhibit 2*.  On May 13, 2024, after full consideration of all public comments received, HHS/CDC issued a final rule that becomes effective on August 1, 2024.  *See* Final Rule, 89 Fed. Reg. 41726, attached hereto as *Exhibit 3*.

The final rule contains three updates:  1) it requires that all dogs entering the United States be microchipped; 2) it requires that all dogs entering the United States be at least six months old; and 3) it requires all dogs entering the United States to have a CDC Dog Import Form.  *Exhibit 3*, 41726.  These updates are aimed at preventing and deterring the importation of dogs with falsified rabies vaccine documentation from high-risk countries which, in turn, safeguards public health.  *Id.*

## II.     Factual Background

Rabies is nearly 100% fatal in both humans and animals after clinical signs appear.  *See Exhibit 1*, ¶ 6.  It kills more than 59,000 people each year, 40% of whom are children.  *Id.*  It can spread to people and pets alike if they are bitten or scratched by a rabid animal.  *Id.*  Most rabies deaths in people around the world are caused by dog bites.  *Id.*

To prevent the spread of dog rabies, in conjunction with maintaining dog import regulations since 1956, the United States spent millions of dollars over the course of several decades to implement rabies vaccination requirements and surveillance/tracking systems.  *Exhibit 1*, ¶ 7.  As a result of these efforts, dog rabies in the United States was eliminated in 2007, an accomplishment which is considered one of the most important public health achievements of the 20th century.  *Id.*

Though rabies in the United States is generally now limited to wild animals like bats, raccoons, skunks, and foxes, dog rabies is still prevalent in many countries around the world.  *Id.*

¶ 6.   Approximately one million dogs enter the United States from foreign countries each year, including approximately 100,000 dogs from countries at a high risk for rabies.  *Exhibit 1*, ¶ 9.   As explained in the 2021 temporary suspension, the importation of even one dog with rabies threatens to reintroduce the virus into the United States.   86 FR 32042.   Dog rabies has been highly successful in adapting to new host species, including wildlife, and one infected dog could result in transmission to humans, domestic pets, or other wildlife.   *Id.*   Such a public health threat could result not only in the loss of human and animal life, but also undermine the millions of dollars and decades of work that went into eliminating the disease.[4]   *Exhibit 1*, ¶ 7; *Exhibit 3*, 41726.

Because dog rabies has been eliminated from the United States, the only way it may be reintroduced is through foreign importation.   Therefore, to prevent that from happening, the United States expends significant time and resources responding to each instance of suspected rabies from a dog import.   The CDC estimates that the cost of responding to each such incident, which includes a public health investigation, tracing, and subsequent care of persons exposed to the disease, ranges from $220,897 to $521,828 per incident.   *See Exhibit 1*, ¶ 11.

### A.      An Increase in Fraud

At the time the temporary suspension went into effect in 2021, four rabid dogs had already been imported into the United States.   *Exhibit 1*, ¶¶ 12-15.   All four dogs were imported by animal rescue groups for the purpose of pet adoption, and three out of the four cases involved fraud.   *Id.*

---

[4] Though, as described above, dog rabies has been eliminated in the United States due to its vaccination efforts and tracking systems, that does not mean that reintroduction of the virus is impossible.   The revised regulation considered, for example, that in Malaysia, which, like the United States, had been declared dog rabies free, the virus was reintroduced in 2017.   *See Exhibit 1*, 41800.   Despite the large public health response, DMRVV has not yet been re-eliminated in Malaysia and 45 people have died after having been infected between 2017 and 2022.   *Id.*

Although at first blush the importation of four rabid dogs may not seem consequential, upon further inspection, its effects are far-reaching:

- In 2015, an animal rescue group imported a rabid dog as part of a group of eight dogs and 27 cats brought to the United States for adoption. Animal rescue workers later admitted that the dog's rabies vaccination documentation had been intentionally falsified to evade CDC entry requirements. As a result of this single incident, public health officials recommended that 18 people receive rabies post-exposure prophylaxis ("PEP"), seven dogs underwent a six-month quarantine, and eight additional dogs housed in the same home as the rabid dog had to receive booster vaccinations and undergo a 45-day monitoring period.

- In 2017, a "flight parent" (*i.e.*, an air traveler accompanying an animal for import on behalf of an animal rescue group) imported four dogs into the United States. One of the dogs became agitated and bit the flight parent prior to flight. The dog was later determined to have rabies. Public health officials recommended that at least four people receive rabies PEP, and the remaining three dogs underwent quarantine periods ranging from 30 days to six months. An investigation revealed the possibility of falsified rabies vaccination documentation presented on entry to the United States.

- In 2019, an animal rescue group imported a single rabid dog as part of a larger shipment of 26 dogs brought to the United States for adoption. All 26 dogs appeared to have valid rabies vaccination certificates and adequate rabies antibody titers (*i.e.*, a test that determines levels of antibodies in the blood) based on the paperwork that accompanied the dogs on arrival. The paperwork was later confirmed to be false based on rabies antibody testing performed at a United States laboratory. The public health investigations and subsequent cost of care for people exposed to this one rabid dog was over $408,000.

- In 2021, an animal rescue group imported a rabid dog as part of a larger shipment of 33 dogs brought to the United States for adoption. Eighteen people received post exposure prophylaxis because of contact with the rabid dog from the time it arrived in the United States until the time it was euthanized, which was just under three days. Ten health departments were involved in the public health investigation and had to locate and communicate with all individuals who may have had contact with the dogs.

*See Exhibit 1*, ¶¶ 12-15.

Additionally, in 2020 the CDC observed a 52% increase in the number of dogs that were ineligible for admission due to falsified or fraudulent documentation. *See Exhibit 3*, 41726. This troubling trend continued in 2021, with an additional 24% increase in dogs ineligible for admission in just the first half of the year. *Id.* Further complicating matters, when one false rabies vaccination

record is discovered as part of a large shipment of multiple dogs, it raises suspicion that the rabies vaccination documents for the remaining dogs may also be false which, in turn, creates an additional burden on CDC and local health departments to track, test, and evaluate remaining dogs in the shipment. *Id.*

### B.     Responding to the Increase in Fraud

As described above, this rise in fraudulent vaccination documentation was shortly followed by the COVID-19 pandemic and the need for the temporary suspension in 2021 of dogs entering the United States from high-risk countries. *Exhibit 2*, 43979. Much was learned from the temporary suspension. Most notably, the temporary suspension created a system that, among other things, utilized serologic titer test results (*i.e.*, blood tests) to demonstrate the presence of rabies antibodies in dogs. *Id.* After the titer system was implemented, the CDC noticed a decrease in fraudulent documentation, fewer dogs being denied admission into the United States, fewer sick dogs upon arrival, and a reduction in the need for federal and state resources to respond to issues relating to inadequately vaccinated dogs upon arrival. *Id.* Thus, when it issued the NPRM in July 2023, the CDC proposed a similar regulatory framework based on the documented successes of the titer system in reducing fraud and, therefore, protecting the public health, during the temporary suspension. *Id.*

### 1.     The Titer System and the Six-Month Age Requirement

The CDC determined that it wanted to implement a serologic titer system to decrease fraud in dog importations because, as a blood test, it was demonstrably less susceptible to falsification than rabies vaccine certificates. *Exhibit 1*, ¶¶ 18, 20. In the CDC's scientific judgment, a reliable serologic titer test cannot be completed until a dog is six months old.

As an initial matter, the blood for the test can be collected no sooner than 30 days after initial vaccination (*i.e.*, at 4 months of age). *Exhibit 1*, ¶ 22. Then, a waiting period is required. *Id.* Because the rabies virus has a long and variable incubation period (anywhere from one to three months), rabies experts vary on when they consider a dog safe for importation after blood collection. *Exhibit 1*, ¶¶ 22-23. Some rabies experts recommend waiting a minimum of 30 days after blood collection (*i.e.*, 5 months of age) before importation, while the World Organization for Animal Health takes a more conservative approach and recommends waiting a minimum of 90 days after blood collection (*i.e.*, 7 months of age) before importation. *Id.* The CDC carefully weighed the potential risk of importing a dog too soon against the burden of waiting on dog importers and determined that the average amount of time recommended by the experts—60 days (*i.e.*, 6 months of age)—was an appropriate waiting period. *Id.* ¶ 23. To that end, in its NPRM, the CDC indicated that a dog would need to be six months old to be imported to the United States. *See Exhibit 2*.

The six-month age requirement also aligns the CDC with current USDA regulations under the Animal Welfare Act that already require dogs imported for resale to be at least six months old on arrival. *See* 9 C.F.R. §§ 2.150-2.153; *see also Exhibit 1*, ¶ 28. Unlike personal pet owners, people who import dogs for purposes of resale, rescue, or adoption often lack any personal knowledge of an animal's veterinary history and cannot reliably know whether the dogs they are importing have been exposed to zoonotic diseases prior to travel. *Id.* They also may not reliably know whether the dogs they are importing are ill, are displaying unusual behaviors that may indicate the presence of a serious zoonotic disease (such as rabies) or have had recent exposure to other sick domestic animals, wildlife, or livestock. *Id.* By aligning the six-month age requirement with current USDA requirements for import, the CDC is removing an incentive for commercial

importers to misrepresent the reason why puppies are being imported or to engage in deception regarding the health histories of these dogs.  *Id.*  This helps protect the public's health because the CDC cannot reliably prevent commercial importers from falsely presenting dogs as personal pets at ports of entry or from reselling dogs before or after they have been allowed into the United States.  *Exhibit 1*, ¶ 30.  Again, it takes only one dog with a falsified vaccination status to reintroduce dog rabies or introduce another serious zoonotic disease or public health concern in the United States.[5]

## 2.    Proposed Exception To Six Month Age Requirement In NPRM

In the NPRM, the CDC proposed a limited exception to the six-month age requirement for individuals seeking to import up to three personal pet dogs in a calendar year so long as the dogs arrived via a land border crossing from Mexico or Canada and the dogs had not been in a high-risk country in the previous six months.  *Exhibit 1*, ¶ 32; *Exhibit 2*, 43993.  The CDC included this exception in its proposal for two reasons:  1) because it believed that such importations could be consistent with bi-national personal pet ownership; and 2) to accommodate United States-based travelers who frequently crossed the land border with Mexico or Canada and chose to take their personally owned dogs with them via car.  *Exhibit 1*, ¶¶ 32-33; *Exhibit 2*, 43980.  The exception was never intended to benefit animal rescue groups choosing to divert operations from countries non-contiguous to the United States to cross the United States at a land border (*i.e.*, choosing to

---

[5] Although preventing the reintroduction of dog rabies is of primary public health importance, other zoonotic disease of concern from imported dogs include:  antimicrobial resistant enteric bacteria, like E. Coli, Campylobacter, and Salmonella; Brucellosis; Gastrointestinal parasites (e.g., roundworms, tapeworms); Leishmaniasis; Leptospirosis; and Tick-borne diseases. *Exhibit 2*, ¶ 37.  In general, four-month-old dogs are more susceptible to these kinds of diseases than six-month-old dogs because of their developing immune systems which are more vulnerable to the stresses of travel, adoption, rehoming, exposure to other animals, and other environmental stressors.  *Id.*

fly from the Caribbean to Mexico or Canada and then crossing over into the United States via land, instead of flying directly to the United States). *Id.* ¶ 33.

During the proposal period, however, the CDC noted numerous instances in which importers transferred dogs from high-risk countries to Mexico or Canada (low risk countries, respectively) and then made claims at the United States border that the dogs had not been in a high-risk country for the past six months. *Id.* ¶ 34. The CDC was able to work with CBP and various airlines to confirm that the importers had, in fact, traveled from high-risk countries with fraudulent rabies vaccination documents and were attempting to avoid United States entry requirements. *Id.* Based on these experiences, the CDC determined that allowing dogs under six months of age to enter via land border crossings could create a significant burden on CBP officers. More importers would attempt to enter the United States through a land border crossing to evade entry requirements, as they were already doing, and more resources would be necessary to determine their admissibility. *Id.* ¶ 35. In the meantime, more people could potentially be exposed to the disease. *Id.*

To that end, the CDC declined to adopt the proposed exception in its final rule in favor of a uniform age requirement for all dog imports to prevent United States land border crossings from becoming overwhelmed with dog imports and to remove the possibility for importers to evade entry requirements by diverting through Canada or Mexico. *Exhibit 1*, ¶ 36.

## ARGUMENT

In evaluating a Motion for Stay under the APA, courts consider four factors: 1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; 2) whether the applicant will be irreparably injured absent a stay; 3) whether the balance of equities tips in the applicant's favor; and 4) where the public interest lies. *See Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 20 (2008).  As the party seeking preliminary relief, Plaintiffs bear the burden of establishing that the factors weigh in their favor.  *See Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117 (1st Cir. 2011).  They have not done so here.

### A.      Likelihood of Success on the Merits

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).  In support of their Motion for Stay, Plaintiffs argue that the final rule—and its six-month age requirement, in particular—"radically alters" the "successful regulation that has been in place since 1956" and upon which they have relied for "years"; does not "rationally" advance the CDC's goal of preventing the re-introduction of dog rabies to the United States; and is "unsupported by any evidence."  Doc. 13, p. 1.  To that end, they claim the update is arbitrary and capricious and exceeds the CDC's statutory authority.

### 1.      The Final Rule Is Not Arbitrary Or Capricious.

The APA requires agencies to engage in reasoned decision-making and it directs that agency actions be "set aside" if they are "arbitrary or capricious."  *Id.*  The Supreme Court has explained that this standard of review is "narrow, and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Simply put, agency action is presumptively valid.  *See Rhode Island Hosp. v. Leavitt*, 548 F.3d 29, 33 (1st Cir. 2008).  That said, an agency must examine the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made."  *Id.*  "Normally, an agency rule would be arbitrary and capricious

if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

HHS and CDC have articulated a satisfactory explanation for revising its dog import regulation to include a six-month minimum age requirement for all dogs.  In the NPRM, HHS and CDC explained that its regulation was being updated "to prevent and deter the importation of dogs with falsified or fraudulent rabies vaccine documentation." *Exhibit 3*, 43978.  This was because fraud was on the rise and at least four rabid dogs were imported into the United States between 2015 and 2021—three of whom, from animal rescue groups, had falsified rabies vaccination certificates.  Concerned that "[t]he importation of just one dog infected with DMRVV risks re-introduction of the virus into the United States", the CDC proposed an updated regulatory framework based on the documented successes of the serologic titer system in reducing fraud during the temporary suspension period.  *Id.*, 43979.  The CDC determined, in its scientific judgment, that a dog needs to be six months old for its serologic titer test to be reliable, and so it imposed a six-month minimum age requirement on all dog imports.[6]  This requirement is rationally related to HHS/CDC's goal of reducing fraud and preventing the reintroduction of rabies to the United States.

Allowing rabies-free countries to have a different minimum age requirement (or no age requirement at all), as Plaintiffs desire, would jeopardize the CDC's goal of reducing fraud because it would incentivize importers from high-risk countries to divert dogs through rabies-free

---

[6] Additionally, this framework mitigates the need for suspending dogs from high-risk countries from being imported into the United States.

countries.  This is not a hypothetical risk.  The CDC has already seen importers from high-risk countries attempt to divert dogs through Canada and Mexico while claiming, falsely, that the dogs had not been in high-risk countries in the six months prior.  This demonstrates that importers are willing to divert dogs through countries with more advantageous entry requirements for their personal gain.  In stating that they lost their "lifeline" when the three personal pet exception for contiguous countries was removed from the final rule, Plaintiffs themselves admit that they too intended to take advantage of the exception—even though it was never intended to apply to them.  The exception sought to accommodate *personal pet owners* arriving in the United States *via a U.S. land port through Canada or Mexico*.  *Exhibit 2*, 43980 (emphasis added).  Not organizations importing dogs from non-contiguous countries.

Simply put, the data showed that the CDC's concerns were accurate and that having different age requirements for dogs from rabies-free or low-risk countries would only incentivize importers to divert dogs from high-risk countries through low-risk countries.  Having a uniform age by which all dogs can be imported, regardless of the risk level of the dog's country of origin, better supports the CDC's goal of reducing fraud and, therefore, protecting the public from being exposed to DMRVV or other zoonotic diseases from foreign dogs.

Though Plaintiffs lament that they have relied on the old rule for "years", that does not render the update "arbitrary" or "capricious".  The CDC is authorized to update its rules so long as it provides a reasoned explanation for the change.  *See Encino Motorcars, LLC v. Novarro*, 136 S. Ct. 2117, 2125 (2016).  The explanation "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).  But the agency must ordinarily "display awareness that it *is* changing its position" and "show that there are good reasons for the

new policy."  *Id.* (emphasis in original); *see also National Labor Relations Bd. v. Lily Transp. Corp.*, 852 F.3d 31, 36 (1st Cir. 2017).

The CDC has done that here.  Moreover, as Plaintiffs recognize, the prior dog import regulation had not been updated since 1956.  It therefore did not account for the significant changes in the dog import landscape over the last 67 years, including the growth of the animal rescue industry, the number of dogs being shipped internationally for resale and adoption, and the accompanying increase in fraud.  The six-month age requirement is a reasoned response, grounded in scientific evidence based on the time it takes to secure a reliable serologic titer test result, to protect public health amidst this new dog importation landscape.

Finally, in asserting that the "irrational (*i.e.*, arbitrary and capricious) nature of the CDC's new regulation is demonstrated further by the fact that the CDC continues to impose no rabies vaccination requirement on a dog that enters the United States having been born and raised in a country that the CDC has declared rabies-free", Plaintiffs miss the point.  The final rule is aimed at deterring the evasion of entry requirements imposed on high-risk countries.  There is no need for additional requirements on low-risk importations if the dog was truly born and raised in a rabies-free country.

## 2.    The Final Rule Does Not Exceed HHS/CDC's Statutory Authority.

Section 361 of the Public Health Service Act, 42 U.S.C. § 264, authorizes the Secretary of HHS to make and enforce such regulations as in the Secretary's judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the United States and from one State or possession into any other State or possession.  Plaintiffs do not dispute HHS/CDC's regulatory authority to impose a minimum age restriction on dog imports as they take no issue with the four-month age restriction for dogs from high-risk countries in the

1956 regulation.   Rather, Plaintiffs challenge the six-month minimum age requirement only because, in their view, it is not "necessary" to prevent the spread of dog rabies.  Doc. 13, p. 7.

But the Supreme Court has stated that, in the context of 42 U.S.C. § 264(a), "necessary" measures include measures that "directly relate" to preventing the foreign introduction and interstate spread of disease by identifying, isolating, and destroying the disease itself.  *See Alabama Ass'n of Realtors v. Dep't of HHS*, 594 U.S. 758, 763 (2021).  The six-month age requirement falls squarely within the measure of identifying and isolating dogs with rabies to ensure a rabid dog cannot be imported into the United States.  In the CDC's expertise, a serological titer, which confirms whether a dog is infected with rabies, cannot be completed until a dog is six months old. HHS/CDC thus did not exceed their authority in enacting a regulation that directly relates to preventing the reintroduction of dog rabies to the United States.

### 3.     The Notice And Comment Provisions Of The APA Were Satisfied.

To the extent Plaintiffs claim the final rule violates the notice and comment provisions of the APA by not including the exception for dogs being imported by owners from contiguous countries, Plaintiffs' argument falls flat.[7]

Under 5 U.S.C. § 553, an agency must publish a general notice of proposed rulemaking in the Federal Register and provide interested parties an opportunity to comment.  5 U.S.C. § 553(b) and (c).  Notice is adequate if it clearly apprises interested parties of the issues at stake in the proposed rule to the extent the parties may participate in the rulemaking in a meaningful way.  *See American Medical Ass'n v. United States*, 887 F.2d 760, 767 (7th Cir. 1989).  An agency may

---

[7] Defendants include this argument for the sake of completeness only.  Plaintiffs do not raise an argument concerning the notice and comment provisions in their Motion for Stay, though it is referenced in their Amended Complaint.

ultimately deviate from its proposed rule because "[a]gencies are free—indeed, they are encouraged—to modify proposed rules as a result of the comments they receive." *Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472, 498-99 (D.D.C. 2020). Thus, "[a]n agency can make even substantial changes from the proposed version, as long as the final changes are in character with the original scheme and a logical outgrowth of the notice and comment." *Natural Res. Def. Council, Inc. v. U.S. E.P.A.*, 824 F.2d 1258, 1283 (1st Cir. 1987) (internal citation omitted). "The crucial issue…is whether parties affected by a final were put on notice that their interests were at stake." *American Med. Ass'n v. United States*, 887 F.2d 760, 768 (7th Cir. 1989).

Here, the proposed rule put Plaintiffs on notice that, once the rule went into effect, the dogs they were importing would need to be six months old. Plaintiffs were thereafter free to comment on the rule and participate in the rulemaking in a meaningful way. Despite this, Plaintiffs contend they did not know their interests were at stake until their "lifeline" was removed—*i.e.*, when the CDC opted not to include the exception for three personal pets being imported from contiguous countries in the final rule. But this exception was never intended to be a "lifeline" for dog rescue groups. It was intended to accommodate bi-national personal pet owners and U.S.-based travelers who frequently crossed the land border with Mexico or Canada. That Plaintiffs refer to this exception as their "lifeline" is troubling because it strongly validates the CDC's concern that the exception would have been quickly abused by animal rescue groups that would have rearranged flights and re-structured their operations in such a manner as to enter the United States through a land border. Plaintiffs seek to import dogs from Caribbean islands—not countries contiguous to the United States—and thus should have known that the exception did not apply to them.

Because the CDC's decision not to include the exception in its final rule did not impact Plaintiffs' interests, and Plaintiffs were fully informed of the six-month minimum age requirement

17

at the time the proposed rule was issued, the final rule does not violate the notice and comment provisions of the APA.

### B.        Irreparable Harm

A demonstration of irreparable harm is a "necessary threshold showing for awarding preliminary injunctive relief." *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).  In fact, even the existence of "some irreparable harm" does not conclusively justify preliminary relief. *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004) (upholding denial of preliminary injunction on a First Amendment claim even though "a burden on protected speech always causes some degree of irreparable harm").  To that end, even if a Plaintiff can cross the irreparable harm threshold, "other factors in the balance might weigh against awarding temporary injunctive relief." *See Northwest Bypass Group v. U.S. Army Corps of Engineers*, 453 F. Supp. 2d 333, 342 (D.N.H. Sep. 15, 2005).

Here, Plaintiffs allege they will be irreparably harmed if the stay does not enter because 1) in their view, families are less likely to adopt puppies after six months of age; 2) they will have to care for rescued dogs for an additional two months; and 3) their organizational costs will increase because it is more expensive to ship older (and, therefore, bigger dogs) from the Caribbean. *See* Doc. 13, pp. 7-8.  But these concerns all involve some level of speculation in that they assume that, but for the revised regulation, each dog in their care would have been adopted at four months.  *See Public Serv. Co. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1997) (recognizing that preliminary relief is not warranted by tenuous or overly speculative forecast of anticipated harm).  However, even if the Court were to conclude that Plaintiffs would be irreparably harmed if the stay did not issue in that they would incur some economic losses that

cannot be recouped,[8] given the gravity of the potential harm at issue—the reintroduction or introduction of communicable diseases to the United States—the other three factors weigh in favor of denying preliminary relief in this case.  *See Northwest*, 453 F. Supp. 3d at 342.

## C.      Balance of Harms and Public Interest

The final two preliminary relief factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  In support of their position that these factors tip in their favor, Plaintiffs argue that the "CDC's new regulation is arbitrary and capricious and, therefore, exceeds the authority that Congress has delegated to the CDC."  *Doc. 13*, p. 8.  For the reasons discussed above, the new regulation is not arbitrary or capricious and does not exceed HHS/CDC's statutory authority.  But also, the balance of harms and the public interest weigh heavily in the government's favor.

At its core, the revised regulation is aimed at protecting the public health by decreasing fraud and, therefore, the spread of communicable diseases, in dog imports.  Based on the data before them, public health officials determined that the universal six-month age requirement will deter fraud by decreasing the likelihood that importers from high-risk countries will attempt to divert dogs through low-risk countries.  The six-month age requirement was not selected arbitrarily but, rather, was determined scientifically based on how long it takes to complete a reliable serologic titer for rabies in dogs.  In balancing the equities and considering the public interest in the context of CDC regulations aimed at protecting the public health, courts properly decline to

---

[8] In general, economic harm in and of itself is not sufficient to constitute irreparable injury. *See Puerto Rico Hosp. Supply, Inc. v. Bos. Sci. Corp.*, 426 F.3d 503, 507 (1st Cir. 2005).  However, courts have recognized that economic harm may be irreparable where no adequate remedy at law exists for a plaintiff to recover its alleged damages.  *See Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003).

second-guess the judgments of public health officials.  *See e.g.*, *TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 840 (W.D. Tenn. 2020); *Tigges v. Northam*, 473 F. Supp. 3d 559, 573-74 (E.D. Va. 2020); *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 543 (E.D.N.C. Jun. 8, 2020).  This Court should likewise decline to second-guess the judgment of public health officials here.

Plaintiffs also contend that "a stay will serve the public's interest in ensuring that Potcakes from rabies-free Caribbean islands remain available for adoption in the same way they have been since 1956."  Doc. 13, p. 8.  But Plaintiffs frame the public's interest too narrowly by focusing on the interests of their organizations rather than the public's interest at large.  *See Massachusetts Correction Officers Federated Union v. Baker*, 567 F. Supp. 3d 315, 327 (D. Mass. Oct. 15, 2021). While finding homes for street dogs from Caribbean islands is a commendable mission, reducing fraud and preventing the reintroduction of dog rabies to the United States—a disease that is 100% fatal in both humans and animals alike after clinical signs appear—is of paramount concern to the broader public interest.

## CONCLUSION

For the reasons described above, Plaintiffs have failed to sustain their burden in support of their Motion for Stay.  As a result, their Motion should be denied.

However, should the Court determine that a stay is warranted, the stay should be limited to the Plaintiffs identified in the Amended Complaint.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

*/s/ Nicole M. O'Connor*
NICOLE M. O'CONNOR
Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3112
Nicole.O'Connor@usdoj.gov

Date:  July 26, 2024

## CERTIFICATE OF SERVICE

I, Nicole M. O'Connor, hereby certify that I served a true copy of the above document upon all parties of record via this court's electronic filing system on July 26, 2024.  Paper copies will be sent to any non-registered participants on July 26, 2024.

Date:   July 26, 2024

*/s/ Nicole M. O'Connor*
NICOLE M. O'CONNOR
Assistant United States Attorney